# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROLAND G. LOVERN, JR.,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:16cv00025 |
| | ) | |
| **NANCY A. BERRYHILL,**[1] | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Roland G. Lovern, Jr., ("Lovern"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lovern protectively filed a previous DIB claim on July 3, 2008, alleging disability as of April 30, 2008, which was denied by decision dated October 28, 2009.[2] (Record, ("R."), at 64-74.) While this decision was on appeal to the Appeals Council, Lovern protectively filed a new application for DIB[3] on October 28, 2009, alleging disability as of October 24, 2009,[4] based on a back/spinal injury, anxiety, depression and hypertension. (R. at 18, 210-13, 239, 243.) The claim was denied initially and on reconsideration. (R. at 108-12, 114-18, 119, 120-22, 124-26.) Lovern then requested a hearing before an administrative law judge, ("ALJ"), (R. at 127.) The ALJ held a hearing on October 28, 2011, and by decision dated February 2, 2012, the ALJ denied Lovern's claims. (R. at 18-28, 35-60.) This denial was appealed, (R. at 13), and the Appeals Council denied Lovern's request for review. (R. at 1-4.) Lovern then filed an action in this court

---

[2] Because Lovern filed a prior application for DIB, which was denied by decision dated October 28, 2009, (R. at 64-74), this prior decision is res judicata as to the time period considered. That being the case, the question before the court is whether Lovern was disabled at any time between October 29, 2009, the date following the ALJ's prior denial, and December 31, 2013, the date last insured. Any facts included in this Memorandum Opinion not directly related to this time period are included for clarity of the record.

[3] On October 10, 2012, Lovern filed a third application for DIB. (R. at 640, 711.) The Appeals Council found this claim to be duplicate and consolidated it with the application at issue. (R. at 640, 711.)

[4] Lovern lists October 24, 2009, as his alleged onset date in his applications. However, because this date was contained within the prior time period considered by the previous ALJ, the earliest onset date that Lovern can allege is October 29, 2009, the date following the date of the previous ALJ's decision. (R. at 64-74.)

seeking review of the ALJ's unfavorable decision.

By Opinion and Order entered September 29, 2014, in Case No. 2:13cv00014, the undersigned remanded Lovern's claim to the Commissioner based on her finding that substantial evidence did not support the ALJ's finding that Lovern did not suffer from a severe mental impairment. (R. at 713-53.) On remand from this court, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further consideration.[5] (R. at 709-11.) On remand, a video hearing was held before an ALJ on June 9, 2015. (R. at 680-708.)

By decision dated January 28, 2016, the ALJ denied Lovern's claim. (R. at 639-70.) The ALJ found that Lovern met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013.[6] (R. at 643.) The ALJ also found that Lovern had not engaged in substantial gainful activity during the period October 29, 2009, through the date last insured, December 31, 2013. (R. at 643.) The ALJ found that the medical evidence established that Lovern suffered from severe impairments, namely lumbar spine degenerative disc disease status-post laminectomy; cervical spine degenerative disc disease; obesity; depression; anxiety; pain disorder; social phobia; and panic

---

[5] The ALJ's decision dated February 2, 2012, was vacated by the Appeals Council, (R. at 709-11); thus, the ALJ's decision, having been vacated, never became final. Therefore, the doctrine of res judicata does not apply. *See Monroe v. Colvin*, 826 F.3d 176, 187 (4th Cir. 2016); *see also Batson v. Colvin*, 2015 WL 1000791, at *7 (E.D.N.C. Mar. 5, 2015) ("Here, *Albright* and AR 00–1(4) did not require the second ALJ to consider the first ALJ's decision because that decision had been vacated, and thus no finding remained to be considered in the subsequent determination."); *Sanford v. Colvin*, 2016 WL 951539, at *3 (M.D.N.C. Mar. 9, 2016)("[T]he ALJ's prior decision had no preclusive effect on the decision at issue here, as the 2011 decision was vacated and a new hearing was conducted.").

[6] Therefore, Lovern had to show that he was disabled between October 29, 2009, the day following the date of the ALJ's prior decision, and December 31, 2013, the date last insured, in order to be eligible for DIB benefits.

attacks, but he found that Lovern did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 643, 655.) The ALJ found that Lovern had the residual functional capacity to perform low-stress sedentary work[7] which allowed a sit/stand option at will; that did not require him to climb ladders, ropes or scaffolds; that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crawling or crouching; that did not require him to work around moving machinery or heights; and did not require more than occasional interaction with the public or co-workers. (R. at 657.) The ALJ found that, through the date last insured and the date of his decision, Lovern could not perform his past relevant work. (R. at 668.) Based on Lovern's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured and through the date of his decision, jobs existed in significant numbers in the national economy that Lovern could perform, including jobs as an assembler, a weight tester and a cuff folder. (R. at 669.) Thus, the ALJ found that Lovern was not under a disability as defined under the Act from October 24, 2009,[8] through December 31, 2013, the date last insured, and was not eligible for benefits. (R. at 670.) *See* 20 C.F.R. § 404.1520(g) (2017).

## II. Facts

Lovern was born in 1978, (R. at 210, 685), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education

---

[7] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2017).

[8] Again, the appropriate date that the ALJ should have considered is October 29, 2009.

and some college course work. (R. at 43, 250, 685.) He has past relevant work experience as a field supervisor for a communications company, a butcher and a product support advisor in a call center for a consumer electronics business. (R. at 244, 254, 686-88.)

At his June 2015 hearing, Lovern testified that counseling had been beneficial. (R. at 694.) He stated that medication helped his symptoms of depression. (R. at 694-95.) Lovern reported that he watched television, played video games and read daily. (R. at 285.) He reported that he did not need reminders to take care of his personal needs or to take his medications. (R. at 283.) Lovern reported that he had no problems getting along with authority figures and that he handled stress "fairly well." (R. at 287.)

On December 12, 2011, AnnMarie E. Cash, a vocational expert, completed vocational interrogatories concerning Lovern's work-related abilities. (R. at 304-07.) She was asked to assume a hypothetical individual of Lovern's age, education and work experience, who had the residual functional capacity to perform sedentary work that required only occasional stooping, kneeling, crawling and crouching and positional changes every 45 minutes. (R. at 305.) She stated that the individual could perform Lovern's past work as a product support advisor/customer service. (R. at 305.) Cash also stated that the individual could perform other jobs that existed in significant numbers, including a ticket checker, a telephone clerk and a general office clerk. (R. at 306.)

Cash completed a second set of interrogatories[9] indicating that, an individual of Lovern's age, education, work experience who was limited to performing

---

[9] These interrogatories are not dated; however, it appears that they were completed in 2012 since they were mailed to Cash on January 17, 2012. (R. at 314, 319.)

sedentary work that required no squatting, stooping, crouching, crawling, working around unprotected heights, ladder climbing or stair stepping and who required position changes every 30 to 45 minutes, could not perform Lovern's past work. (R. at 318, 320-21.) She stated that due to the hypothetical individual being limited to sedentary work that did not allow stooping, there would be no jobs available that the individual could perform. (R. at 320.) Cash was asked to assume the same individual, but who would be limited to standing and/or walking a total of two hours in an eight-hour workday, but without interruption for 30 minutes; sit for a total of two hours in an eight-hour workday without interruption for 30 minutes; never stoop, kneel, crouch or crawl; and who would be absent from work more than two days a month. (R. at 320.) Cash stated that there would be no jobs available that such an individual could perform. (R. at 320.) Cash was asked to assume the same individual, but who had no useful ability to deal with work stresses or to maintain attention/concentration and who would be absent from work more than two days a month. (R. at 321.) She stated that there would be no jobs available that such an individual could perform. (R. at 321.) Cash was asked to consider the same individual, but who had an unsatisfactory ability to interact appropriately with the public, supervisors or co-workers; to respond appropriately to usual work situations and changes in a routine work setting; and who would be absent from work more than two days a month. (R. at 321.) She stated that there would be no jobs available that such an individual could perform. (R. at 321.)

Asheley Wells, a vocational expert, also was present and testified at Lovern's June 2015 hearing. (R. at 701-06.) Wells testified that a hypothetical individual of Lovern's age, education and work history, who could perform low-stress, light[10] work that did not require him to climb ladders, ropes or scaffolds or

---

[10] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he

to work around moving machinery or heights; that required only occasional climbing of ramps or stairs, kneeling, stooping, crouching or crawling; and that required occasional decision making, changes in the work setting or interaction with the public or co-workers could not perform Lovern's past work, but that he could perform other jobs existing in significant numbers in the national economy, including jobs as a night cleaner, an assembler and a packing line worker, all at the light level of exertion. (R. at 703-04.) Wells next testified that the same hypothetical individual, but who could stand and/or walk two hours in an eight-hour workday, sit up to six hours of an eight-hour workday and occasionally operate foot controls, could perform sedentary jobs such as an assembler, a weight tester and a cuff folder. (R. at 704-05.) Wells stated that the same individual, but who would be limited to lifting items weighing up to 10 pounds occasionally, could perform the jobs previously identified. (R. at 705.) Wells was asked to consider the same individual, but who could not engage in a production rate or pace work; who would be distracted 20 percent of the workday; and who would be absent from work at least two times a month. (R. at 705-06.) She stated that such an individual could not perform any work. (R. at 706.)

On September 9, 2015, Wells completed a set of interrogatories indicating that, an individual of Lovern's age, education and work experience who was limited to performing low-stress, sedentary work that required a sit/stand option, provided the individual remained on task while in either position; that required no climbing of ladders, ropes or scaffolds; that required only occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching or crawling; that did not require him to work around moving machinery or heights; and that required no more than occasional interaction with the public or co-workers could perform a

also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2017).

significant number of medium[11] exertion jobs, including jobs as a meat cutter, a cable installer and a technical support advisor. (R. at 827-30.) She stated that there also was a significant number of sedentary jobs available that such an individual could perform, including jobs as an assembler, a weight tester and a cuff folder. (R. at 829.)

In rendering his decision, the ALJ reviewed medical records from Dr. Patricia Vanover, M.D.; Norton Community Hospital; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker; Holston Valley Medical Center; Solutions Counseling, LLC; Stone Mountain Health Services; Dr. Kevin Blackwell, D.O.; Mountain View Regional Medical Center; Johnston Memorial Hospital; Crystal Burke, L.C.S.W.; Arthritis Associates of Kingsport, P.L.L.C.; Associated Neurologists of Kingsport; Dr. Ken W. Smith, M.D.; Blue Ridge Neuroscience Center; and Wellmont Health System.

The record shows that on August 9, 2000, when Lovern was only 22 years old, he underwent complete bilateral L4 and L5 and partial S1 laminectomies and medial facetectomies with additional resection of the left L5-S1 herniated nucleus pulposus by Dr. Ken W. Smith, M.D., a neurosurgeon. (R. at 373-76.) When Lovern was discharged in satisfactory condition on August 11, 2000, it was noted that he had significant improvement of leg pain. (R. at 377-78.)

X-rays of Lovern's lumbar spine, dated July 24, 2009, showed postsurgical changes at the L4-L5 level, some mild narrowing at the L4-L5 level, as well as minimal change at L3-L4 level. (R. at 347.) Mild scattered degenerative spurring

---

[11] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2017).

also was present with no spondylolysis. (R. at 347.) Mild degenerative changes also were present in the lower facets. (R. at 347.) It was concluded that there was no acute abnormality. (R. at 347.)

On September 21, 2009, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Lovern at the request of Lovern's attorney. (R. at 355-65.) Lovern reported his daily activities to include watching television, reading and playing computer games, but basically staying at home. (R. at 359-60.) Lovern's speech was clear and intelligible, and his grooming and hygiene were adequate. (R. at 359-60.) His affect was described as mixed. (R. at 360.) Lovern reported that antidepressant medication had been helpful and that he was only occasionally irritable. (R. at 360.) He indicated no significant problems with memory or concentration. (R. at 360.) Lanthorn noted no signs of ongoing psychotic processes or any evidence of delusional thinking. (R. at 360.)

Lanthorn administered the Wechsler Adult Intelligence Sale – Fourth Edition, ("WAIS-IV"), and Lovern achieved a full-scale IQ score of 108. (R. at 356, 361.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), which indicated the presence of some depression, which contributed to social withdrawal and some erratic to poor concentration at times. (R. at 362-63.) The test results also indicated the presence of some anxiety, tension, worry and emotional discomfort. (R. at 363.) Lanthorn noted that Lovern seemed to worry to excess, which also contributed to problems with concentration. (R. at 363.) The test results also indicated that Lovern's concentration skills and memory were adequate. (R. at 363.)

Lanthorn diagnosed Lovern with a pain disorder associated with both psychological factors and general medical conditions, chronic; a mood disorder

with major depressive-like episode, moderate, due to chronic physical problems, pain and limitations; and alcohol abuse in sustained full remission; and he assessed Lovern's then-current Global Assessment of Functioning, ("GAF"),[12] score at 55.[13] (R. at 364.) Lanthorn felt that Lovern had no limitations regarding learning simple or moderately complicated tasks in the work setting and only mild limitations with regard to sustaining concentration and persisting at tasks. (R. at 365.) He opined that Lovern had mild to moderate difficulties dealing with the changes and requirements in a work setting. (R. at 365.)

Lanthorn also completed a mental assessment, indicating Lovern had an unlimited ability to understand, remember and carry out simple job instructions; a satisfactory ability to follow work rules, to relate to co-workers, to maintain attention and concentration and to understand, remember and carry out detailed job instructions; and a seriously limited ability to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to understand, remember and carry out complex job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 366-68.) Lanthorn opined that Lovern would be absent more than two days monthly from work due to his impairments or treatment. (R. at 368.)

The record shows that Lovern saw D. Kaye Weitzman, L.C.S.W., a licensed

---

[12] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[13] A GAF score of 51 to 60 indicates that an individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. See DSM-IV at 32.

clinical social worker, from September 2009 through April 2013. Weitzman diagnosed Lovern with a mood disorder; a generalized anxiety disorder; a major depressive disorder; agoraphobia with panic disorder; social phobia; and anxiety. (R. at 369, 502-04, 539-42, 558-65, 613, 624, 851-60, 908-09.) In September 2009, Weitzman assessed Lovern's then-current GAF score at 40,[14] with his highest score being 75[15] within the past year. (R. at 369.) During this time, Weitzman repeatedly described Lovern's mood as depressed with an anxious affect, his orientation and thought processes were intact, and his judgment and insight were deemed fair. (R. at 369, 503-04, 539-42, 558-65, 613, 624, 851-60.) In May 2010, September 2011, April 2012 and May 2012, Weitzman noted that Lovern displayed paranoia and delusions. (R. at 540, 624, 857-58.) In March 2010, Lovern reported that his medication helped him to rest, which improved his mood. (R. at 542.) In September 2010, Lovern reported that he felt "much better" and was without panic. (R. at 563.) Weitzman noted that Lovern was "maintaining decreased panic." (R. at 563.) In May 2011, Lovern reported that he was "doing well" with his medications. (R. at 559.)  In September 2011, Lovern complained of increased panic. (R. at 624.) Weitzman noted that Lovern's mood was depressed and irritable with an anxious affect, his orientation and thought processes were intact, and his judgment and insight were deemed fair. (R. at 624.) Weitzman noted that Lovern was decompensating due to increased pain. (R. at 624.) In February 2012, Weitzman reported that Lovern was not functioning at a competitive level despite Lovern's reports that he was doing well on medications. (R. at 860.) In January 2013 and

---

[14]    A GAF score of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  *See* DSM-IV at 32.

[15] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors …; no more than slight impairment in social, occupational, or school functioning…." DSM-IV at 32.

February 2013, Weitzman reported that Lovern was decompensating secondary to pain, panic attacks and depression. (R. at 851-82.)

On March 22, 2013, Weitzman completed a mental assessment,[16] finding that Lovern had a seriously limited ability to maintain personal appearance. (R. at 862-64.) She found that Lovern had no useful ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex, detailed and simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 862-63.) Weitzman found that Lovern would be absent from work more than two days monthly due to his impairments or treatment. (R. at 864.)

On October 12, 2009, Lovern saw Dr. Patricia Vanover, M.D.,[17] with complaints of increasingly severe low back pain. (R. at 505-06.) Lovern stated that he could care for his own needs and that he took pain medication sparingly due to fear of addiction. (R. at 505.) Lovern had marked tenderness of the lumbosacral paraspinal muscles, and range of motion was restricted. (R. at 505.) Station was normal, but gait was slow and ambling. (R. at 505.) Dr. Vanover diagnosed hypertension, chronic low back pain, depression and chronic gout. (R. at 505.) On April 28, 2010, physical examination showed that Lovern's gait was slow and

---

[16] Weitzman completed four other mental assessments on September 23, 2009, (R. at 499-501); November 23, 2009, (R. at 513-15); July 21, 2011, (R. at 566-68); and October 11, 2011, (R. at 625-27.)

[17] The record shows that Lovern treated with Dr. Vanover from 2006 through 2015 for hypertension; chronic low back pain; chronic gouty arthritis; depression; anxiety; obesity; abdominal pain; degeneration of intervertebral disc site, unspecified; testicular hypofunction, unspecified; and hyperlipidemia. (R. at 327-28, 330-32, 334-35, 337, 345, 474, 505, 538, 545-46, 600, 603, 606, 609, 612, 871, 874, 879, 936, 939, 969.)

ambling, he exhibited marked tenderness in the lumbosacral area with spasm, and his range of motion was restricted. (R. at 537.) Lovern was oriented, and his memory, mood, affect, judgment and insight were normal. (R. at 537.) Dr. Vanover reminded Lovern to remain as active as possible. (R. at 538.) On July 27, 2010, Lovern reported that his medications helped his symptoms of depression and anxiety, but that they did not completely alleviate them. (R. at 543.) Lovern was oriented, and his memory, affect, judgment and insight were normal. (R. at 544.) He had a depressed mood. (R. at 544.)

On September 7, 2010, Lovern stated that he was "extremely anxious" most of the time. (R. at 610.) Lovern reported taking an occasional Xanax, which helped him. (R. at 610.) He further reported that his pain medication worked "fairly well," but he still had a great deal of pain. (R. at 610.) Lovern described his hypertension as under good control. (R. at 610.) Physical examination showed that Lovern's gait was slightly unsteady, and there was tenderness over the lumbosacral area. (R. at 611.) Range of motion of the back was decreased secondary to pain and body habitus. (R. at 611.) Lovern's orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 611.) On October 25, 2010, Lovern reported that Xanax XR was helping with anxiety, but he remained "quite anxious" and had difficulty sleeping due to pain. (R. at 607.) Lovern exhibited tenderness over the lumbosacral area and decreased range of motion secondary to pain and habitus. (R. at 608.) His orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 608.) On December 29, 2010, Lovern exhibited tenderness over the lumbosacral muscles and decreased range of motion secondary to pain and body habitus. (R. at 605.) Lovern's orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 605.)

On April 26, 2011, Lovern reported that his anxiety was not controlled even

with an increased dose of Xanax XR. (R. at 601.) He further noted continued "quite severe" pain. (R. at 601.) Lovern stated that, although his pain medication helped, he still could not do much of anything. (R. at 601.) Dr. Vanover noted that Lovern exhibited tenderness over the lumbosacral muscles and decreased range of motion secondary to pain and body habitus. (R. at 602.) Orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 602.) On July 26, 2011, Lovern complained of increased right leg pain. (R. at 598.) He reported continued anxiety, but noted his medication was working "fairly well." (R. at 598.) Lovern exhibited tenderness over the lumbosacral muscles and decreased range of motion secondary to pain. (R. at 599.) Orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 599.) On August 30, 2011, an MRI of Lovern's lumbar spine showed previous laminectomies at L4 and L5 and small central disc protrusions at these levels with only mild foraminal encroachment on the left at the L5-S1 level. (R. at 614-15.)

On September 9, 2011, Dr. Vanover completed a mental assessment,[18] finding that Lovern had a limited, but satisfactory ability to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 617-19.) She found that Lovern had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; and to understand both detailed and complex job instructions. (R. at 617-18.) Dr. Vanover found that Lovern had no useful ability to deal with work stresses. (R. at 617.) She found that Lovern would miss more than two work days monthly due to his impairments or treatment. (R. at 619.)

---

[18] The record shows that Dr. Vanover completed two prior mental and physical assessments in June 2009 and August 2010. (R. at 339-44, 552-57.)

She did not state any medical or clinical findings to support her assessment. (R. at 617-19.)

On that day, Dr. Vanover also completed medical assessment, finding that Lovern could lift and carry items weighing up to 15 pounds occasionally and up to eight pounds frequently. (R. at 620-22.) She found that Lovern could stand and walk a total of two hours in an eight-hour workday, but for 30 minutes at a time, and that he could sit for a total of two hours in an eight-hour workday, but for 30 minutes at a time. (R. at 620-21.) Dr. Vanover found that Lovern could frequently balance, occasionally climb and never stoop, kneel, crouch or crawl. (R. at 621.) She found that his ability to push/pull was affected by his impairments, but she did not specify how. (R. at 621.) Dr. Vanover found that Lovern could not work around moving machinery or vibration. (R. at 622.) She opined that he would miss more than two days of work monthly due to his impairments or treatment. (R. at 622.) Dr. Vanover failed to specify what medical findings supported her assessment. (R. at 620-22.)

On October 11, 2011, Dr. Vanover opined that Lovern's condition met or equaled the medical listing found at 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04(A), for disorders of the spine. (R. at 623.) On October 25, 2011, Lovern reported that his medications were working, but they did not completely alleviate his symptoms. (R. at 937.) Lovern was oriented, and his memory, mood, affect, judgment and insight were normal. (R. at 938.)

On October 16, 2012, Lovern reported that his medications were helping his pain and that he was able to take care of his own needs and those of his household without difficulty. (R. at 877.) On February 13, 2013, Lovern complained of low back and leg pain and anxiety. (R. at 872.) He reported that his medications were

helping, which allowed him to attend to his activities of daily living and to do small chores around the house. (R. at 872.) Lovern had a normal gait, and he exhibited tenderness in the lower back and decreased range of motion. (R. at 874.) He had appropriate judgment; good insight; intact recent and remote memory; an anxious mood; and appropriate affect. (R. at 874.) On March 25, 2013, Dr. Vanover reported that Lovern had a normal gait, and he exhibited tenderness in the lower back and decreased range of motion. (R. at 871.) He had appropriate judgment; good insight; intact recent and remote memory; an anxious mood; and appropriate affect. (R. at 871.) On May 14, 2013, Lovern reported that his medications helped his pain. (R. at 913.) On April 16, 2015, Lovern reported that he was doing better since having surgery and with seeing a counselor. (R. at 1137.) He reported that he had not experienced any recent panic attacks. (R. at 1137.) Physical examination was normal with the exception of tenderness and limited range of motion in the cervical, lumbar and thoracic spine. (R. at 1139.) His mood was anxious with an appropriate affect. (R. at 1139.)

On April 2, 2010, Dr. Kevin Blackwell, D.O., completed a consultative examination at the request of the state agency. (R. at 527-31.) Dr. Blackwell noted that Lovern did not appear to be in any acute distress, was alert, cooperative, oriented and had good mental status. (R. at 529.) Physical examination revealed symmetrical and balanced gait and good and equal shoulder and iliac crest height bilaterally. (R. at 530.) There was tenderness in the lumbar musculature on the left and in the thoracic muscles on the right, but upper and lower joints had no effusions or obvious deformities. (R. at 530.) Upper and lower extremities were normal for size, shape, symmetry and strength, and Lovern's grip strength was good. (R. at 530.) Fine motor movements and skill activities of the hands were normal, as were reflexes. (R. at 530.) Dr. Blackwell diagnosed chronic low back pain, depression and poorly-controlled hypertension. (R. at 530.) Dr. Blackwell

opined that Lovern could occasionally lift items weighing up to 35 pounds and frequently lift items weighing up to 20 pounds. (R. at 531.) He opined that Lovern should be able to sit for six hours in an eight-hour workday and stand for two hours in an eight-hour workday, assuming a positional change every 30 to 45 minutes. (R. at 530.) Dr. Blackwell further opined that Lovern should be able to operate a vehicle, as well as bend at the waist and kneel, one-third of the day. (R. at 530.) He opined that Lovern could not squat, stoop, crouch, crawl, work at unprotected heights or climb ladders or stairs. (R. at 530.) Dr. Blackwell opined that Lovern could perform above-head reaching activities one-third of the day with either arm and perform foot pedal operating one-third of the day with either foot. (R. at 530.) He placed no limitations on hand usage, including fine motor movements and skill activities of the hands, and he imposed no vision, communication, hearing or environmental limitations. (R. at 530-31.) Dr. Blackwell noted that his objective findings would correlate with Lovern's subjective complaints to the degree supported in his report. (R. at 531.) He further noted his belief, within a reasonable degree of medical probability, that Lovern was at maximum medical improvement, and he did not anticipate a significant change in limitations over the next 12 months. (R. at 531.)

On April 27, 2010, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment, indicating that Lovern could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 83-84.) He found that Lovern could stand and/or walk a total of two hours in an eight-hour workday with normal breaks and could sit for about six hours in an eight-hour workday with normal breaks. (R. at 83.) Dr. Surrusco found that Lovern must periodically alternate between sitting and standing to relieve pain and discomfort. (R. at 83.) He found that Lovern could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; and his ability to

balance was unlimited. (R. at 83.) No manipulative, visual or communicative limitations were noted. (R. at 84.) Dr. Surrusco found that Lovern must avoid all exposure to hazards, such as machinery and heights. (R. at 84.)

On April 28, 2010, Jeanne Buyck, PC, a state agency psychological consultant, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Lovern had no restrictions on his activities of daily living, experienced only mild difficulties in maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of extended-duration decompensation. (R. at 80-81.) Buyck also completed a mental assessment, finding that Lovern's symptoms would result in moderate difficulties with extended attention and concentration and with his ability to respond appropriately to changes in the work setting. (R. at 84-86.) She found that Lovern had mild difficulties with social interactions. (R. at 85.) Buyck concluded that Lovern's mental impairments were nonsevere and limited him to simple, routine work with limited contact with the public. (R. at 86.)

On July 26, 2010, Jo McClain, PC, a state agency psychological consultant, completed a PRTF, finding that Lovern was mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning, experienced moderate difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 96.) McClain also completed a mental assessment, finding that Lovern was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public;

to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 99-101.) McClain specified that Lovern's depression, anxiety and irritability resulted in some difficulties with social interactions. (R. at 101.)

On July 26, 2010, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding that Lovern could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 97-99.) Dr. Spetzler found that Lovern could stand/walk a total of about six hours in an eight-hour workday and sit a total of about six hours in an eight-hour workday, but that he must periodically alternate between sitting and standing to relieve pain and discomfort. (R. at 98.) He found that Lovern could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 98.) Dr. Spetzler found that Lovern should avoid all exposure to hazards, such as machinery and heights. (R. at 99.)

Lovern received counseling for depression and anxiety from Crystal Burke, L.C.S.W., a licensed clinical social worker, from August 2013 through April 2015. (R. at 996-1011, 1106-23, 1164-72.) In August 2013, Lovern reported that his symptoms of depression had improved, but that he continued to struggle with anxiety. (R. at 1008.) He stated that he spent his days at home watching television, playing video games and being on the computer. (R. at 1008.) Burke reported that Lovern was alert and oriented; his memory was intact; and his thoughts were free of any delusions and perceptual disturbances. (R. at 1008.) In December 2013, Lovern reported that significant pain interfered with his daily activities. (R. at 1120.) In February 2014, Burke reported that Lovern was only mildly depressed.

(R. at 998.) In March 2014, Lovern reported that his panic attacks were not as severe since taking medication. (R. at 996.) In May 2014, Lovern complained of being more irritable, depressed, withdrawn and struggling with concentration. (R. at 1116.) He reported that his grandmother was ill, which caused him additional stress. (R. at 1116.) Burke reported that Lovern's mood and thought process were depressed. (R. at 1116.) In July 2014, Lovern reported significant stress with health issues, family and finances. (R. at 1111.) His mood was depressed and anxious. (R. at 1111.) In September 2014, Lovern reported that he was not as depressed. (R. at 1109.) He stated that he was irritable and agitated. (R. at 1109.) In January 2015, Lovern stated that he was trying to keep his mind busy and that he was not as depressed. (R. at 1170.) Burke reported that Lovern was mildly depressed. (R. at 1170.) In March 2015, Lovern reported that he was not as depressed, but still complained of anxiety. (R. at 1167.) In April 2015, Lovern reported that he was benefiting from pain and anti-anxiety medication, stating that his depression was not as severe. (R. at 1164.)

On May 5, 2015, Burke completed a mental assessment,[19] finding that Lovern had a satisfactory ability to understand, remember and carry out simple job instructions and to demonstrate reliability. (R. at 1180-82.) She found that Lovern had an unsatisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1180-81.) Burke opined that Lovern had no useful ability to understand, remember and carry out complex job instructions. (R. at 1181.) Burke

[19] Burke completed two other mental assessments on October 21, 2013, and January 5, 2015. (R. at 941-43, 1125-27.)

found that Lovern would be absent from work more than two days monthly due to his impairments or treatment. (R. at 1182.)

On May 26, 2015, Burke reported that, overall, Lovern's mood was stable. (R. at 1184.) While treating Lovern, Burke reported that Lovern's hygiene and grooming were deemed fair to good. (R. at 1002, 1004, 1111, 1114, 1118, 1164, 1170.)

Lovern was treated by Dr. Annette Marie Abril, M.D., from December 2013 through January 2015 for gout management and low back, neck and ankle pain. (R. at 954-64, 1018-41, 1130-35.) During this time, Lovern reported that medications helped his pain and weight loss, and diet helped his gout. (R. at 954, 1023.) In January 2015, Lovern reported that his pain had resolved since having surgery. (R. at 1130.)

Lovern was treated by Dr. Ken W. Smith, M.D., for complaints of cervical pain and left upper extremity pain from August 2014 through March 2015. (R. at 1043-59, 1155-62.) On September 29, 2014, an electroneuromyography showed bilateral median mononeuopathies at the wrists with no other signs of entrapment neuropathy or cervical neuropathy noted. (R. at 1016-17.) On November 21, 2014, Lovern underwent an anterior cervical diskectomy and fusion of the C5-C6 disc space. (R. at 1066-69, 1073-80.) Following surgery, Lovern reported that he was doing well and rated his health as excellent. (R. at 1043, 1155, 1159.) Examination showed that Lovern had difficulty performing tandem gait; he had no limitation of motion in his upper extremities; and he had normal muscle strength and tone in his upper and lower extremities. (R. at 1044, 1048, 1156-57, 1160.) On April 27, 2015, an x-ray of Lovern's cervical spine showed a fracture of the C6 screws, and interbody bone graft remained intact and in good position. (R. at 1174.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2017); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2017).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Lovern argues that the ALJ failed to give full consideration to Weitzman's assessment when determining his mental impairments. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-10.) He contends that Weitzman's assessment is supported by the opinions of Dr. Vanover, Lanthorn and Burke. (Plaintiff's Brief at 7-10.) Lovern also argues that the ALJ improperly determined his residual functional capacity by mischaracterizing the

assessments of Dr. Vanover and Dr. Blackwell. (Plaintiff's Brief at 10-14.) Lovern further argues that the ALJ failed to give appropriate credence to his testimony and to properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 14-17.)

Lovern first argues that the ALJ failed to give full consideration to Weitzman's assessment when determining his mental impairments. (Plaintiff's Brief at 7-10.) He contends that Weitzman's assessment is supported by the opinions of Dr. Vanover, Lanthorn and Burke. (Plaintiff's Brief at 7-10.)

The ALJ noted that Weitzman's November 2009 opinion that Lovern was either moderately or markedly limited in his ability to perform all work-related mental abilities "provides little explanation or rationale except to say the physical pain will cause limitation in claimant's ability to focus." (R. at 513-14, 666.) *See* 20 C.F.R. § 404.1527(c)(3) (2017) (stating that the more a medical source explains and provides relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight will be given to that an opinion). Furthermore, Weitzman's opinion was inconsistent with her September 2009 opinion that Lovern had only mild to moderate impairments in mental functioning. (R. at 499-501, 666.) The ALJ noted that Weitzman's own treatment notes did not support any decline in Lovern's mental functioning that would support such a dramatic change in her opinion. (R. at 499-501, 666.) Rather, Weitzman's October 2009 treatment notes reflected that Lovern had only mildly decreased attention and concentration abilities. (R. at 504.) *See Johnson v. Barnhart*, 434 F.3d 650, 656, n.8 (4th Cir. 2005) (stating that an ALJ can reject a medical opinion that conflicts with earlier opinions from the same source when there has been no intervening change in diagnosis).

In addition to being inconsistent with her own recent September 2009 opinion, the ALJ noted that Weitzman's November 2009 opinion was inconsistent with Lovern's description of his functioning. (R. at 666.) In his November 2009 Adult Function Report, Lovern did not indicate any significant limitation in his functioning due to pain-related concentration difficulties. Rather, Lovern indicated that he had no difficulties with his memory, understanding, completing tasks or following instructions. (R. at 269.) Lovern also indicated that he was able to perform activities requiring a great deal of attention such as driving a car, managing his own finances, reading and playing video games, which he did "daily" and "very well." (R. at 267-68.) Lovern's own description of his functional abilities also cast doubt upon Weitzman's opinion that he had moderate to marked limitations of mental functioning.

The ALJ explained that he discounted Weitzman's August 2010 opinion because it appeared to be based primarily on Lovern's self-reported physical condition. (R. at 548-50, 666.) For example, as support for finding that Lovern had "fair" to "poor/none" ability to function in all areas of mental work-related functioning, Weitzman stated, "[p]atient has had 2-3 back surgeries. He has debilitating chronic pain. He will not react in a stable manner. He is very limited in what he can do physically. He is <u>not</u> a malingerer. His pain & limits are real." (R. at 550.) However, the ALJ noted that Lovern had not undergone two or three back surgeries; therefore, undermining the basis of Weitzman's findings.[20] (R. at 666.)

---

[20] Lovern had back surgery in August 2000, after which he returned to work until April 2008. (R. at 688-90.) In 2014, Lovern underwent an anterior cervical diskectomy and fusion of the C5-C6 disc space. (R. at 1066-69, 1073-80.) Following surgery, Lovern reported that he was doing well and rated his health as excellent. (R. at 1043, 1155, 1159.) Examination showed that Lovern had difficulty performing tandem gait; he had no limitation of motion in his upper extremities; and he had normal muscle strength and tone in his upper and lower extremities. (R. at 1044, 1048, 1156-57, 1160.)

The ALJ noted that the medical evidence from 2010 did not support Weitzman's assessment that Lovern's pain would substantially interfere with his ability to function in a work environment. (R. at 666.) Dr. Vanover's treatment notes throughout 2010 and 2011 show that Lovern's orientation, memory, judgment and insight were normal. (R. at 537, 544, 599, 602, 605, 608, 611, 666.) During 2010, Lovern repeatedly reported to Dr. Vanover that his medications helped his symptoms of depression and anxiety. (R. at 543, 607, 610.) Moreover, Weitzman's own treatment notes from May 2010 showed that Lovern endorsed only mild depression, anxiety, irritability and crying spells. (R. at 540, 666.) In March 2010, September 2010 and May 2011, Lovern reported to Weitzman that he had an improved mood and felt "much better," was without panic and was doing well with his medications. (R. at 542, 559, 563.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ explained that he assigned reduced weight to Weitzman's July 2011 and October 2011 opinions because they were apparently premised on Weitzman's belief that Lovern's physical limitations prevented him from working "at any competitive level" and because Weitzman provided no medical/clinical findings to support her assessments. (R. at 566-68, 625-27, 667.) The ALJ noted that Weitzman opined that Lovern had essentially no useful ability to function in any work-related domain, with the exception of being able to maintain his personal appearance. (R. at 566-67, 625-26, 667.) As the ALJ noted, apart from Lovern's own statement that he mostly stayed at home, this conclusion was not supported by the evidence. (R. at 667.) Rather, in July 2011 and October 2011, Lovern told Dr. Vanover that his medications were working fairly well. (R. at 598, 937.) Dr. Vanover reported that, although Lovern had some tenderness and reduced range of motion in his back secondary to pain, his gait and station were normal, as were his

orientation, memory, mood, affect, judgment and insight. (R. at 599.) Lovern reported in an Adult Function Report that he left his house one to two times per day and was able to drive a car and visit with family bi-weekly. (R. at 284-85.) In January 2013, Lovern reported that he had recently returned from a trip to Florida. (R. at 852.) These facts adequately supported the reduced weight that the ALJ assigned to Weitzman's July 2011 and October 2011 opinions.

The ALJ explained that he gave "little weight" to Weitzman's March 2013 opinion that Lovern had no useful ability to perform all mental work-related activities, except for maintaining his personal appearance, because she failed to indicate any clinical findings to support it. (R. at 667, 862-63.) Furthermore, Weitzman premised her opinion on the fact that Lovern had supposedly been "injured 2-3 times during high school sports" and that Lovern could not perform "normal work." (R. at 667, 864.) However, Weitzman did not identify what high school sports injuries she was referring to, what impact they had on the mental functional categories she was assessing or what she meant by "normal" work. (R. at 667, 864.)

Lovern argues that the ALJ should have credited Weitzman's opinions because they were consistent with Dr. Vanover's December 2009, August 2010, and September 2011 opinions. (R. at 519-21, 555-57, 617-19.) The ALJ explained that he did not credit these portions of Dr. Vanover's assessments because Dr. Vanover is not a psychiatrist, and her treatment notes did not reflect such extreme mental limitations. (R. at 665.) Dr. Vanover consistently reported that Lovern's orientation, memory, mood, affect, judgment, and insight were normal. (R. at 599, 602, 605, 608, 611.) In addition, Lovern repeatedly reported that his medications helped his pain and depression. (R. at 543, 598, 607, 610, 872, 877, 913, 937.)

Lovern also argues that Weitzman's opinions are supported by Lanthorn's September 21, 2009, consultative psychological evaluation, in which he opined that Lovern would likely be absent from work more than two days per month. (Plaintiff's Brief at 8-9; R. at 368.) The ALJ explained that he assigned "little weight" to Lanthorn's opinion because it was not supported by Lanthorn's own objective evaluation findings. (R. at 661.) The ALJ noted that Lanthorn rated Lovern's GAF score at 55, indicating only moderate psychological symptoms. (R. at 364, 661.) In addition, Lovern reported that he had no significant problems with memory or concentration, he had no delusional thinking, and his concentration and memory were adequate during the evaluation. (R. at 360-63, 661.) The ALJ noted that Lanthorn's "evaluation report did not document limitations that would necessitate an absence of more than two days of work per month." (R. at 661.)

Lovern additionally argues that Weitzman's opinions are supported by Burke's October 2013, January 2015, and May 2015 opinions that Lovern was seriously limited in his ability to make occupational, performance and personal-social adjustments and would miss more than two days of work per month. (Plaintiff's Brief at 9; R. at 941-43, 1125-27, 1180-82.) However, the ALJ explained that he gave "little weight" to Burke's opinions because Burke did not provide any rationale or explanation for her opinions. (R. at 668.) Furthermore, Burke's January 2015 and May 2015 opinions post-dated the expiration of Lovern's insured status on December 31, 2013, and did not relate back to the relevant period. (R. at 668.) In any case, the ALJ noted the evidence from 2015 showed that Lovern was doing well with extended release Xanax and was benefitting from pain and anti-anxiety medication. (R. at 668, 1137, 1164.) Burke noted that Lovern's symptoms of depression improved with medication; his mood was stable; his hygiene and grooming were fair to good; and his memory was intact. (R. at 1008-09, 1164, 1167, 1170.) Additionally, in 2014 and 2015, Lovern

reported his medications helped his pain and that he was doing much better since having neck surgery and seeing a counselor. (R. at 1043, 1137, 1155, 1159.) Lovern's muscle tone and strength were normal in his upper and lower extremities, he was doing well in physical therapy, and he felt his left arm was getting stronger. (R. at 668, 1159-60.) Based on this, I find that the ALJ properly weighed the medical evidence pertaining to Lovern's mental residual functional capacity.

Lovern next argues that the ALJ improperly determined his residual functional capacity by mischaracterizing the assessments of Dr. Vanover and Dr. Blackwell. (Plaintiff's Brief at 10-14.) Lovern contends that Drs. Vanover and Blackwell found that he could not complete a full eight-hour workday and that he did not have the ability to stoop, which would eliminate all employment. (Plaintiff's Brief at 10-14.) The ALJ did not state that Dr. Vanover and Dr. Blackwell limited Lovern to sedentary work. Rather, he stated that he credited their opinions to the extent that they supported the ability to do sedentary work, but rejected them to the extent that they were inconsistent with the ALJ's overall residual functional capacity finding. (R. at 663-64.)

With respect to Dr. Vanover, the ALJ gave "significant weight" to her December 2009, August 2010, and September 2011, opinions that Lovern was limited to sedentary exertional work with the need for a sit/stand option at will. (R. at 522-24, 552-54, 620-22, 663.) However, the ALJ did not credit Dr. Vanover's opinions that Lovern should never stoop, kneel, crouch, or crawl; that he had limitations with regard to pushing and pulling; and that he would be required to miss more than two days of work monthly due to his impairments or treatment. (R. at 664.) The ALJ stated that he did not credit these portions of Dr. Vanover's assessments because she offered no explanation for them, and the objective medical evidence did not support any limitations that would interfere with

Lovern's ability to be present for work activities on a consistent basis. (R. at 664.) The ALJ noted that September 2010 emergency room notes showed that Lovern had equal strength in all four extremities, he could ambulate independently, and he could "perform all activities of daily living without assistance." (R. at 582, 664.) On September 7, 2010, Dr. Vanover reported that Lovern's gait was only slightly unsteady. (R. at 611, 664.) A lumbar MRI in August 2011 showed previous L4 and L5 laminectomies and only small central disc protrusion at these levels, with only mild foraminal encroachment at L5-S1. (R. at 614, 664.) These findings did not support Dr. Vanover's opinion that Lovern had limitations inconsistent with the ability to perform a limited range of sedentary work on a full-time basis.

The ALJ gave partial weight to the opinion of Dr. Blackwell, the consultative examiner, noting that he gave too much weight to Lovern's subjective complaints in severely limiting his nonexertional functions. (R. at 527-31, 663.) The ALJ found that Dr. Blackwell's findings that Lovern could not stoop, crouch, crawl, climb ladders or climb stairs were not supported by his own evaluation of Lovern. (R. at 663.) Dr. Blackwell's physical examination of Lovern revealed a symmetrical and balanced gait and good and equal shoulder and iliac crest height bilaterally. (R. at 530.) Lovern exhibited tenderness in the lumbar musculature on the left and in the thoracic muscles on the right, but upper and lower joints had no effusions or obvious deformities. (R. at 530.) Upper and lower extremities also were normal for size, shape, symmetry and strength, and Lovern's grip strength was good. (R. at 530.) Fine motor movements and skill activities of the hands were normal, as were reflexes.  (R. at 530.)  Romberg's sign was negative, and proprioception was intact. (R. at 530.) Dr. Blackwell opined that Lovern could lift items weighing up to 35 pounds occasionally and up to 20 pounds frequently, he could sit for six hours in an eight-hour workday and stand for two hours in an eight-hour workday, assuming a positional change every 30 to 45 minutes. (R. at

530-31.) Thus, Dr. Blackwell's relatively benign physical examination findings do not support the restrictive limitations he imposed on Lovern.

Lovern also argues that the ALJ failed to give appropriate credence to his testimony and to properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 14-17.) Based on my review of the record, I find that the ALJ considered Lovern's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers....

76 F.3d at 595.

I find that the ALJ reasonably found that Lovern's subjective complaints of

disabling functional limitations were not credible. (R. at 657.) The ALJ found that Lovern's medically determinable impairments could reasonably be expected to cause the symptoms alleged. (R. at 657.) However, the ALJ found Lovern's statements concerning the intensity, persistence and limiting effects of his symptoms "not entirely credible" because they were inconsistent with the evidence as a whole. (R. at 657.) The medical evidence shows that Lovern's muscle tone and extremity strength generally were within normal range. (R. at 530, 581, 589, 660.) Records in 2014 show that Lovern rated his own health as "excellent." (R. at 660, 1057.) While Lovern, at times, exhibited an impaired gait, many of his physical examinations showed that his gait was normal. (R. at 660, 871, 874, 878.) Lovern repeatedly reported benefiting from his medication, allowing him to care for his personal needs and those of his household without difficulty, and he denied medication side effects. (R. at 660, 856, 872, 877.) No significant memory deficits have been documented, and Dr. Vanover's notes showed that Lovern generally had a normal mood, affect, judgment and insight. (R. at 599, 602, 605, 608, 611, 660, 871, 874.) Lovern demonstrated an "ability and willingness to learn," he spoke clearly, ambulated independently, had normal behavior and had equal strength in all four extremities. (R. at 582, 660.)

Based on the above, I find that substantial evidence exists in the record to support the ALJ's finding that Lovern was not disabled. An appropriate Order and Judgment will be entered.

DATED:     December 8, 2017.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE